In re Kent Edwin **FICKEN** and Roberta Pauline Ficken, Debtors.

Internal Revenue Service, Plaintiff–Appellant,

v.

Kent Edwin Ficken and Roberta Pauline Ficken, Defendants–Appellees.

BAP No. CO–09–042.
Bankruptcy No. 05–52940.
Adversary No. 08–01687.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

May 7, 2010.

Submitted on the briefs: *

Karen L. Pound, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for Plaintiff–Appellant.

Judith A. Shively of Shively & Demos, P.C., Erie, Colorado, and Joseph A. Peiffer of Day Rettig Peiffer, P.C., Cedar Rapids, Iowa, for Defendants—Appellees.

Before CORNISH, Chief Judge, NUGENT, and KARLIN, Bankruptcy Judges.

NUGENT, Bankruptcy Judge.

This appeal addresses 11 U.S.C. § 1222(a)(2)(A), a provision introduced by

* See Order Vacating Appeal from January 26, 2010 Argument Calendar and Deeming Appeal

Submitted on Briefs, Docket No. 64866.

the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The new provision attempts to mitigate the tax expense often incurred by farmers who have significant taxable capital gains or depreciation recapture when their low basis farm assets are foreclosed, sold, or otherwise disposed of by their creditors. Formerly, these dispositions created large priority tax claims that barred confirmation of Chapter 12 plans. By stripping these claims of their priority status and rendering them unsecured claims for distribution and discharge purposes, the drafters of BAPCPA sought to facilitate farmers' use of Chapter 12. Many courts have addressed whether this provision applies to tax on gains realized after the petition date.

Here, the bankruptcy court entered a summary judgment order determining income taxes generated on gains realized from the debtors' post-petition sale of cattle are stripped of their priority and need not be paid in full through the Chapter 12 plan. The IRS appeals. In the absence of reversible error, we AFFIRM.

## I. BACKGROUND FACTS

Kent Edwin Ficken and Roberta Pauline Ficken (the "Fickens" or the "debtors")

own a cattle farm in eastern Colorado. The Fickens filed their Chapter 12 petition and proposed plan on December 2, 2005.[1] An amended plan was filed on January 18, 2006 ("Plan")[2] and confirmed on February 13, 2006.[3]

Paragraph 4.2.7 of the Plan provides that the "Debtors will sell all of the cattle owned by the Debtors no later than December 31, 200[6] and pay the net proceeds to Vectra Bank."[4] Further, the same paragraph provides "11 U.S.C. § 1222(a)(2)(A) shall apply to the sale of the cattle."[5] Paragraph 4.8 of the Plan states:

> In the event that, a claim is owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge, pursuant to 11 U.S.C. § 1222.[6]

Application of 11 U.S.C. § 1222(a)(2)(A)[7] is advantageous to a debtor because, generally speaking, it strips the priority of income taxes generated by gains on the

---

1. The Fickens had previously filed a Chapter 12 petition on July 25, 2005. However, they dismissed that petition in order to refile after the effective date of BAPCPA due to several BAPCPA provisions advantageous to family farmers, one of which gives rise to this appeal.

2. *Debtors' First Amended Chapter 12 Plan of Reorganization ("Amended Plan"), in* Appellant's App. at 388.

3. *Order Granting Corrected Motion to Confirm and Confirming Debtors' First Amended Chapter 12 Plan of Reorganization, in* Appellant's App. at 456.

4. *Amended Plan* at 6, *in* Appellant's App. at 393. The Plan apparently contains a typo, stating the cattle will be sold no later than December 31, 2005. *See Order on Cross-Motions for Summary Judgment, in* Appellant's App. at 196, n. 1.

5. *Amended Plan* at 6, ¶ 4.2.7, *in* Appellant's App. at 393.

6. *Id.* at 10, ¶ 4.8, *in* Appellant's App. at 397.

7. Unless otherwise indicated, all future statutory references in text are to the Bankruptcy Code, title 11 of the United States Code.

sale of farm assets used in the debtor's farming operation.

In accordance with the Plan, the Fickens sold all of their cattle in 2006. Gains of $62,429 were realized on the sale of 88 calves ("calves" or "calf inventory"), and gains of $77,093 were realized on the sale of 73 cows and 2 bulls ("breeding livestock").[8]

For purposes of determining and paying their 2006 federal income tax, the Fickens treated the tax arising on the ***post-petition*** sale of both the breeding livestock and the calf inventory as a claim owed to a governmental unit within the priority-stripping provision of § 1222(a)(2)(A). They used the "marginal tax allocation method" to calculate the amount of tax eligible for beneficial treatment. Use of this method results in all tax on the income from the sale being treated as an unsecured claim so long as the plan of reorganization is completed and a discharge is granted. Upon reviewing the Fickens' returns, the IRS disagreed that § 1222(a)(2)(A) applied to ***post-petition*** asset sales and assessed additional income tax in the amount of $38,965.

The Fickens filed this adversary proceeding on October 1, 2008, asking the bankruptcy court to determine that their debt "to the Internal Revenue Service as and for 2006 capital gains taxes arising from the sale of their farm property shall be treated as an unsecured claim in their Chapter 12 bankruptcy case pending completion of their Chapter 12 Plan of Reorganization and subsequent discharge."[9] After entering into a stipulation of facts,[10] on May 1, 2009, both parties filed motions for summary judgment.[11] In addition to disputing that § 1222(a)(2)(A) applies to post-petition sales, the IRS asserted that even if § 1222(a)(2)(A) is applicable, the calf inventory was not a farm asset used in the debtors' farming operation, and also that the proportional tax allocation method, as opposed to the marginal method used by the Fickens, is the correct method for calculating taxes falling within the purview of § 1222(a)(2)(A).

On July 30, 2009, the bankruptcy court entered its order on cross-motions for summary judgment.[12] The bankruptcy court ruled in favor of the Fickens on all points of contention, concluding as a matter of law that (1) § 1222(a)(2)(A) applies to post-petition asset sales; (2) the tax generated from the sale of the "calf inventory" is governed by § 1222(a)(2)(A); and (3) the marginal tax allocation method should be used, resulting in beneficial (unsecured) treatment of $38,965.00.[13] The IRS appealed timely. On September 17, 2009, the parties filed a joint motion to stay the appeal.[14] The parties argued that

---

**8.** The combined gain on the sales was therefore $139,522, which represents 63% of the Fickens' gross income of $219,855 for tax year 2006. *See Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166.

**9.** *Complaint to Determine the Nature of Extent of Claim Pursuant to 11 U.S.C. § 507 and § 1222(a)(2)(A) at 4, in* Appellant's App. at 4. We note than an order discharging the debtors was entered on October 7, 2009. *See Bankruptcy Docket No. 115, in* Appellant's Response to Notice of Deficiency and Order to Show Cause.

**10.** *Stipulation of Facts, in* Appellant's App. at 11.

**11.** *Plaintiffs' Motion for Summary Judgment, in* Appellant's App. at 69. *Defendant's Motion for Summary Judgment, in* Appellant's App. at 88.

**12.** *Order on Cross–Motions for Summary Judgment, in* Appellant's App. at 196.

**13.** *Id.* at 15, *in* Appellant's App. at 210.

**14.** *Joint Motion to Stay Appeal* at Docket No. 63774.

because the same issues are currently on appeal in another case pending before the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"),[15] a stay of this appeal until the Tenth Circuit appeal is decided would serve judicial economy and efficiency. A motions panel of this Court denied the motion for stay by order dated September 24, 2009.[16]

## II. APPELLATE JURISDICTION

This Court has jurisdiction to hear time-ly-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[17] Neither party elected to have this appeal heard by the United States District Court for the District of Colorado. The parties have therefore consented to appellate review by this Court.

■ A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' "[18] Here, the bankruptcy court's order on cross-motions for summary judgment resolved all issues and concluded the adversary proceeding.

Thus, the order is final for purposes of review.

## III. STANDARD OF REVIEW

■ A ruling on summary judgment is reviewed *de novo*, applying the same legal standard used by the bankruptcy court.[19] Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[20] "In reviewing a summary judgment motion, the court is to view the record 'in the light most favorable to the nonmoving party.' "[21]

■ Each of the issues on appeal involve the interpretation and application of § 1222(a)(2)(A). There are no disputed facts and, as in the bankruptcy court, this matter presents only legal questions. Legal conclusions are reviewed *de novo*.[22] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[23]

**15.** *United States v. Nazar (In re Dawes)*, Case No. 09–3129. That appeal arises from the District of Kansas. In that case, the Kansas bankruptcy court also ruled that income taxes generated by post-petition asset sales fell within § 1222(a)(2)(A) and were stripped of their priority. The bankruptcy court's decision was affirmed by the Kansas district court. *In re Dawes*, 382 B.R. 509 (Bankr. D.Kan.2008), *aff'd* 415 B.R. 815 (D.Kan. 2009).

**16.** *Order Denying Motion to Stay Appeal* at Docket No. 63835.

**17.** 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002; 10th Cir. BAP L.R. 8001–3.

**18.** *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1

(1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

**19.** *Kojima v. Grandote Int'l Ltd. Liability Co. (In re Grandote Country Club Co., Ltd.)*, 252 F.3d 1146, 1149 (10th Cir.2001).

**20.** Fed.R.Civ.P. 56(c).

**21.** *Grandote*, 252 F.3d at 1149 (quoting *Thournir v. Meyer*, 909 F.2d 408, 409 (10th Cir.1990)).

**22.** *Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

**23.** *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

## IV. ANALYSIS

At issue in this appeal is how to treat taxes generated by gains on the *post-petition* sale of farm assets for purposes of a confirmable Chapter 12 plan. Ordinarily, income taxes are entitled to priority under § 507, and thus must be paid in full through a Chapter 12 plan.[24] However, in 2005, BAPCPA added language to § 1222(a)(2) that created an exception to the general rule for taxes on income realized from the sale of farms assets used in a debtor's farming operation.[25] Taxes falling within this exception are treated as non-priority unsecured claims that are paid their ratable share of the debtor's disposable income, and are discharged if the debtor receives a discharge under § 1228 (hereafter, we refer to this result as "beneficial treatment").[26] Specifically, § 1222(a)(2)(A) provides as follows:

§ 1222. Contents of plan

(a) The plan shall—

. . .

(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—

(A) *the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge; or*

(B) the holder of a particular claim agrees to a different treatment of that claim[.][27]

The exception does not specify whether it applies to income taxes generated by pre-petition sales, post-petition sales, or both. The IRS maintains that tax liabilities resulting from *post-petition* sales are not entitled to the beneficial treatment afforded by § 1222(a)(2)(A). Additionally, the IRS asserts that even if the exception is applicable to post-petition sales, the calves sold by the Fickens were not farm assets *used* in the debtors' farming operation for purposes of § 1222(a)(2)(A). Further, the IRS argues that the *proportional* allocation method, as opposed to the marginal allocation method, is the appropriate method for calculating the amount of taxes within § 1222(a)(2)(A)'s ambit.

The United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") recently addressed the same issues in *Knudsen v. Internal Revenue Service* ("*Knudsen*"),[28] and like the bankruptcy court in this case, resolved all issues in favor of the debtors. We agree with the Eighth Circuit's analysis and conclusions, and based on the following, affirm the bankruptcy court's order.[29]

---

24. 11 U.S.C. §§ 507(a)(2) & (8), 1222(a)(2).

25. 11 U.S.C. § 1222(a)(2)(A).

26. The priority stripping that occurs pursuant to § 1222(a)(2)(A) has been referred to by some courts, including the bankruptcy court below, as resulting in "beneficial treatment" of the tax claims. Clearly, the provision is "beneficial" to the debtors, but, of course, not to the taxing entity. We use the term herein because we find it to be a convenient shorthand reference.

27. 11 U.S.C. § 1222(a)(2)(A) (emphasized portion added by BAPCPA 2005).

28. 581 F.3d 696 (8th Cir.2009).

29. We note that the bankruptcy court did not have the benefit of the Eighth Circuit's decision in *Knudsen* as it was issued after the bankruptcy court's decision in this case. However, the bankruptcy court did have the benefit of the analysis conducted by the Northern Iowa District Court on which the

**A. The bankruptcy court correctly determined § 1222(a)(2)(A) strips the priority of income taxes generated by *post-petition* sales of farm assets**

■ Section 1222(a)(2)(A) refers to *"claims* entitled to priority under section 507." Section 507 gives priority status to and delineates the order of priority for certain *"expenses and claims,"* including two categories of taxes: (1) post-petition taxes that qualify as administrative expenses under § 507(a)(2); and (2) pre-petition taxes allowed under § 507(a)(8).[30] The Fickens' taxes were generated post-petition and do not fall within § 507(a)(8). The IRS argues that neither do they fall within § 507(a)(2) because they do not qualify as administrative expenses, consigning these taxes to a form of bankruptcy limbo.

Section 507(a)(2) provides priority treatment for "administrative expenses allowed under section 503(b) of this title." Section 503(b)(1)(B) provides as follows:

503. Allowance of Administrative expenses.

. . .

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(B) any tax—

(i) *incurred by the estate,* whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title[.] [31]

Based on the above statutory language, the IRS contends that the taxes do not fall within the definition of administrative expenses because they were incurred by the *debtors,* not the *estate.*[32] The linchpin of the IRS's argument is that, unlike bankruptcy cases filed by individuals under Chapters 7 and 11, no "separate taxable estate" or entity is created under the In-

Eighth Circuit relied. The bankruptcy court's analysis and the *Knudsen* analysis are similar in most respects, and in fact the Eight Circuit quoted the bankruptcy court's decision in this case in its discussion of the appropriate method for calculating the amount of taxes stripped of priority. *See id.* at 717.

**30.** Section 507, Priorities, provides in pertinent part:

(a) The following expenses and claims have priority in the following order:

. . .

(2) Second, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

. . .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition—

(i) for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;

(ii) assessed within 240 days before the date of the filing of the petition, exclusive of—

(I) any time during which an offer in compromise with respect to that tax was pending or in effect during that 240–day period, plus 30 days; and

(II) any time during which a stay of proceedings against collections was in effect in a prior case under this title during that 240–day period, plus 90 days.

(iii) other than a tax of a kind specified in section 523(a)(1)(B) or 523(a)(1)(C) of this title, not assessed before, but assessable, under applicable law or b agreement, after, the commencement of the case

**31.** 11 U.S.C. § 503(b)(1)(B) (emphasis added).

**32.** Appellant's Br. at 12.

ternal Revenue Code, codified at title 26 U.S.C. ("IRC"), upon the filing of a Chapter 12 bankruptcy.[33] We are not persuaded by the IRS's argument.

Numerous courts have rejected the IRS's position, holding that "incurred by the estate" means simply "incurred post-petition," and does not require the estate to be a separate taxable entity.[34] In *In re Dawes*, a Kansas bankruptcy court cited the legislative history to § 503(b)(1)(B)(I) which includes certain taxes in the definition of administrative expenses.[35] In affirming the bankruptcy court's decision in *Dawes*, the Kansas district court also found the legislative history persuasive:

> "In general, administrative expenses include taxes which the trustee *incurs in administering the debtor's estate*, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate *during the case.* Interest on tax liabilities and certain tax penalties incurred by the trustee are also included in this first priority." S.Rep. No. 95–989, 95th Cong., 2d Sess. 66 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5852 (italics in original opinion).

Judge Somers also relied on the Report of the Recommendations of the Senate Finance Committee regarding adminis-trative expenses: "Administrative expenses-Taxes incurred *during the administration of the estate* share the first priority given to administrative expenses generally." S.Rep. No. 95–1106, 95th Cong., 2d Sess. 13 (1978) as reported by the Senate Judiciary Committee and the Senate Finance Committee (italics in original opinion).[36]

Likewise, in *Knudsen*, the Eighth Circuit rejected the IRS's argument that "incurred by the estate" requires a separate taxable entity, concluding that "incurred by the estate" means simply "incurred post-petition."[37] The *Knudsen* court also stated

> Additional factors also support our conclusion that postpetition income taxes are "administrative expenses," as such taxes were incurred by the estate, i.e., incurred postpetition. First, the plain language of § 1222(a)(2)(A) does not restrict its application to prepetition sales. Second, it is the [IRC], not the Bankruptcy Code, that creates a "separate taxable entity" upon the filing of petitions by individuals under Chapters 7 and 11 but does not create a separate taxable entity in cases filed by individuals under Chapters 12 and 13. Additionally, even though there is no "separate taxable entity" in a Chapter 12

**33.** Appellee's Br. at 18. *See* IRC § 1398 providing that the estate that is created when an individual files a Chapter 7 or 11 case constitutes a separate taxable entity. Further, IRC § 1399 provides that except in cases governed by IRC § 1398, no separate taxable entity results from a case commencement of any other kind under title 11.

**34.** *See Knudsen*, 581 F.3d at 708–10, and cases cited therein.

**35.** *In re Dawes*, 382 B.R. 509, 516 (Bankr. D.Kan.2008), *aff'd*, 415 B.R. 815 (D.Kan. 2009), *appeal docketed*, Case No. 09–3129 (10th Cir. May 7, 2009).

**36.** *In re Dawes*, 415 B.R. 815, 822–23 (D.Kan. 2009), *appeal docketed*, Case No. 09–3129 (10th Cir. May 7, 2009) (quoting *In re Dawes*, 382 B.R. at 516)(district court quoting bankruptcy court).

**37.** *Knudsen*, 581 F.3d at 708–09 & n. 2. The *Knudsen* court relied in part on its earlier decision in *In re L.J. O'Neill Shoe Co.*, 64 F.3d 1146 (8th Cir.1995). In *O'Neill*, which involved a corporate Chapter 11 debtor and therefore no separate taxable entity for the estate, the Eighth Circuit held that "incurred by the estate" means "incurred post-petition." *O'Neill* 64 F.3d at 1149.

case, an "estate" still exists, pursuant to 11 U.S.C. § 1207(a)[.][38]

We agree with the Eighth Circuit that a separate bankruptcy estate exists under § 1207(a) notwithstanding that the bankruptcy estate is not a separate taxable entity under the Internal Revenue Code.

The farm assets became property of the Chapter 12 estate pursuant to § 541(a) upon commencement of the bankruptcy case, and the income realized on the sale of those assets remains property of the estate under § 541(a)(6) and § 1207(a). Therefore, the estate, and not the debtors, incurred the taxes generated by the post-petition asset sales. Accordingly, we hold the bankruptcy court correctly determined that income taxes generated by gain realized on post-petition sales of qualified farm assets are administrative expenses incurred by the estate within § 503(b)(1)(B) and § 507(a)(2), and therefore must be claims eligible for the beneficial treatment afforded by § 1222(a)(2)(A).[39]

**B. The bankruptcy court correctly determined the calf inventory constituted a farm asset used in the debtors' farming operation for purposes of § 1222(a)(2)(A)**

■ The IRS contends that even if the § 1222(a)(2)(A) exception is applicable to post-petition sales of farm assets, the calf inventory does not fall within the definition of a "farm asset *used* in the debtors' farming operation." Instead, the IRS maintains that the calves were the end product of the farming operation. Therefore, according to the IRS, the calf inventory was sold in the ordinary course of the debtors' farm operation and the income taxes generated on the sale are not entitled to the beneficial treatment afforded by § 1222(a)(2)(A). We disagree.

In *Knudsen*, the Eighth Circuit was presented with an analogous factual issue. In that case, the question was whether the debtors' slaughter hogs were farm assets used in their farrow-to-finish hog operation or the end product of that operation. After construing the plain language of the phrase in three parts: (1) "any farm asset," (2) "used in," and (3) "the debtor's farming operation,"[40] the *Knudsen* court determined the slaughter hogs were farm assets within the coverage of § 1222(a)(2)(A).[41]

Here, as in *Knudsen*, there is no real dispute that the calves were "farm assets," or that the debtors are engaged in a "farming operation." The IRS focuses its argument on the word "use," asserting that it means to "put into action or service."[42] Further, the IRS argues § 1222(a)(2)(A) is analogous to IRC § 1231(b)(3)(B), which addresses capital gains and losses from the sale of business assets. Specifically, that tax code section provides that "property used in the trade or business" includes "livestock ... held by the taxpayer for draft, breeding, dairy, or sporting purposes."[43] The IRS argues that standard should also govern § 1222(a)(2)(A)'s limiting language "used

---

38. *Knudsen,* 581 F.3d at 709 (citations and emphasis omitted).

39. Although a few bankruptcy courts have reached the opposite conclusion, all of those cases have been reversed on appeal, and there is currently no surviving contrary holding. *See Order on Cross–Motions for Summary Judgment* at 3, *in* Appellant's App. at 198.

40. *Knudsen,* 581 F.3d at 710.

41. *Id.* at 714.

42. Appellant's Br. at 20.

43. IRC § 1231(b)(3)(B).

in the debtor's farming operation." [44] In other words, the IRS contends that because the calves were not held for any of the purposes specifically enumerated in IRC § 1231(b)(3)(B), they do not qualify as assets "used" in the farming operation under § 1222(a)(2)(A) of the Bankruptcy Code.

The *Knudsen* court, as well as the bankruptcy court below, refused to determine the meaning of § 1222(a)(2)(A)'s phrase "used in" the farming operation by analogy to IRC § 1231. The *Knudsen* court gave three reasons for its refusal: (1) "[f]irst, if we were to apply the government's interpretation of 'used in,' then, under § 363(c)(1), a trustee or debtor-in-possession could never 'use' inventory because it is not 'a deemed or defined capital asset;'" [45] (2) "[s]econd, § 1222(a)(2)[(A)] is not a federal income tax provision found in the Bankruptcy Code; instead, it is a priority-stripping provision that applies to any tax claim-federal, state, or local;" [46] and (3) "[t]hird, a commonsense understanding of the phrase 'used in' supports the Knudsens' argument that the slaughter hogs were 'used in' their farming operation." [47]

Commentators embrace the principles underlying these holdings. In the seminal bankruptcy tax treatise, *Tax Aspects of Bankruptcy Law and Practice,* Professors McQueen and Williams remind us that—

> The Bankruptcy Code strikes a delicate balance between debtors and creditors. Thus one must be cautious in rushing to the IRC, a body of law that seeks bilateral determinations between the government and a taxpayer, in order to understand provisions in the Bankruptcy Code, a body of law that seeks to resolve multilateral claims and rights in a context far different with far different policies than one would find under the IRC. [48]

In connection with the specific issue of whether "farm assets" should be defined the same way "capital assets" are in the tax code, the authors state—

> New § 1222(a)(2)(A) does not reduce a governmental unit's claim, § 101(5) still controls that determination and directs us to consider applicable nonbankruptcy law like the IRC; rather, § 1222(a)(2)(A) strips priority treatment of certain claims of a governmental unit. Because § 1222(a)(2)(A) is a priority-stripping provision, and priority is an exclusive bankruptcy concept granted by the Bankruptcy Code and no other source of law, it is entirely logical to consider the Bankruptcy Code and its policies in interpreting that section. By arguing that the IRC's restrictive definition of "capital asset" should control the meaning and effect of § 1222(a)(2)(A), the IRS is essentially urging a partial judicial repeal of that section and a reshuffling of the bankruptcy deck at the expense of not only the debtor but also the debtor's unsecured creditors. [49]

In our case, the bankruptcy court declined to refer to the IRC to determine the

---

44. Appellant's Br. at 21.

45. *Knudsen,* 581 F.3d at 713 (citing C. Richard McQueen & Jack F. Williams, *Tax Aspects of Bankruptcy Law and Practice* § 14:9 (3rd ed.2009)).

46. *Knudsen,* 581 F.3d at 713 (emphasis omitted).

47. *Id.* at 714.

48. McQueen & Williams, *Tax Aspects of Bankruptcy Law and Practice at* § 14:9.

49. *Id.*

meaning of the phrase "used in," stating that the definition of "used in" under IRC § 1231(b) relates to the farming operation before the bankruptcy petition was filed. The bankruptcy court held that the "farming operation" referred to in § 1222(a)(2)(A) is the farming operation under the debtor's confirmed plan, and that as long as the assets were used for some purpose of the plan, the asset should be deemed to be "used in the debtor's farming operation." [50]

■ We also note that § 1203 gives a family farmer the right to operate the farm assets, and further, that § 1222(b)(8) expressly contemplates the sale of assets by debtors as part of the reorganization process. Specifically, § 1222(b)(8) states that a Chapter 12 plan may "provide for the sale of all or any part of the property of the estate." Moreover, because the new priority-stripping provision is part of the subsection that outlines the mandatory provisions of Chapter 12 plans, we conclude that the "farming operation" reference in § 1222(a)(2)(A) is to the farming operation of the *reorganized* debtor, and the "use" of the "farm assets" that are sold or otherwise disposed of must necessarily be for purposes of the plan.[51]

We are persuaded by the rationales articulated by both the Eighth Circuit, the bankruptcy court, and the commentators. Common sense tells us that the bankruptcy court correctly determined that the calf inventory was a "farm asset used in the debtor's farming operation," and, therefore, income taxes generated by the sale of the same are eligible for beneficial treatment under § 1222(a)(2)(A).

## C. The bankruptcy court correctly determined the amount of tax afforded beneficial treatment under § 1222(a)(2)(A) is calculated using the marginal tax allocation method

■ The Fickens used the "marginal tax allocation method" ("marginal method") in computing the portion of their 2006 income tax liability that would receive beneficial, unsecured treatment pursuant to § 1222(a)(2)(A). The bankruptcy court concluded the Fickens' use of the marginal method was appropriate. On appeal, the IRS argues that the "proportional tax allocation method" ("proportional method") should be used instead.

Use of the marginal method results in a larger amount of taxes receiving beneficial treatment. This is because the marginal method assumes that the income from the transactions qualifying under § 1222(a)(2)(A) were the "last dollars in," and therefore subject to the highest marginal tax rate. To calculate using the marginal method, the debtor first prepares a tax return reporting all income, including the § 1222(a)(2)(A) qualifying income, and then a second, pro forma tax return removing all qualifying sales income. The difference between the two tax liabilities is the amount of taxes given beneficial, unsecured status for purposes of the Chapter 12 plan. On the other hand, the proportional method calculates the percentage of income attributable to sales of qualifying farm assets relative to total income and then multiplies the total tax liability due by that percentage to determine the § 1222(a)(2)(A) amount. Under the proportional method, therefore, every taxable dollar of income in a year is treated equally for tax purposes, regardless of its

**50.** *Order on Cross–Motions for Summary Judgment,* at 10–11, in Appellant's App. at 205–06.

**51.** *See In re Knudsen,* 389 B.R. 643, 675 (N.D.Iowa 2008), aff'd, 581 F.3d 696 (8th Cir.2009).

source. In this case, the parties agree that if the marginal method is the appropriate method, then $38,965 is the amount of taxes afforded beneficial, unsecured treatment. If the proportional method is used, then the IRS asserts that amount decreases to $16,857.66.[52]

 The statutory language of § 1222(a)(2)(A) does not specify the tax allocation method to be used, likely because the exception relates not only to income taxes, but to other types of claims "owed to a governmental unit."[53] Nor does the statute provide that courts should maximize the amount of taxes to be treated beneficially. However, doubts or ambiguities in bankruptcy statutes "must be liberally construed to give the debtor the full measure of the relief afforded by Congress."[54] Further, if a statute's plain language is ambiguous as to Congressional intent, we may look to legislative history and the public policy underlying the statute.[55]

 As recognized by both the bankruptcy court below and the *Knudsen* court, utilization of the method that provides the greater benefit to farmers better accomplishes Congress' goals in enacting the new priority-stripping provision. Obviously, § 1222(a)(2)(A) is designed to help family farmers reorganize and continue in operation by decreasing the negative tax consequences of selling farm assets. Specifically, in adopting this section, Congress was concerned that if the debtor/farmer could not pay the IRS in full, the IRS would likely veto the plan, and the farmer would likely lose the farm.[56] Consider the following comments regarding the § 1222(a)(2)(A) exception that was originally proposed in 1999, but not enacted until 2005 as a part of BAPCPA:

> "Safety 2000" also helps farmers to reorganize by keeping the tax collectors at bay. Under current law, farmers often face a crushing tax liability if they need to sell livestock or land in order to reorganize their business affairs. According to Joe Peiffer, a bankruptcy lawyer from Hiawatha, Iowa, who represents many family farmers, high taxes have caused farmers to lose their farms. Under the bankruptcy code, the I.R.S. must be paid in full for any tax liabilities generated during a bankruptcy reorganization. If the farmer can't pay the I.R.S. in full, then he can't keep his farm. This isn't sound policy. Why should the I.R.S. be allowed to veto a farmer's reorganization plan? "Safety 2000" takes this power away from the I.R.S. by reducing the priority of taxes during pro-

---

**52.** *See Motion for Summary Judgment* at 12–13, *in* Appellant's App. at 103–04. We express no opinion regarding whether these figures are accurate. For example, having reviewed Exhibit B to Declaration of Tamara L. Kotzker, in Appellant's App. at 166, it would appear that the amount of tax liability that should receive beneficial treatment is $21,836.77. The $16,857.66 figure represents the $21,836.77 reduced by 45% of the taxes paid by the Fickens for 2006, and an overpayment of 2007 taxes by the Fickens kept by the IRS.

**53.** *Knudsen v. IRS,* 581 F.3d 696, 716 (8th Cir.2009).

**54.** *Wright v. Union Cent. Life Ins. Co.,* 311 U.S. 273, 279, 61 S.Ct. 196, 85 L.Ed. 184 (1940).

**55.** *United States v. Manning,* 526 F.3d 611, 614 (10th Cir.), *petition for cert. dismissed,* —— U.S. ——, 129 S.Ct. 780, 172 L.Ed.2d 767 (2008) (quoting *United States v. LaHue,* 170 F.3d 1026, 1028 (10th Cir.1999)).

**56.** *See* 145 Cong. Rec. S750–02, S764 (daily ed. Jan. 20, 1999) (statement of Sen. Grassley on S.260).

ceedings. This will free up capital for investment in the farm, and help farmers stay in the business of farming.[57]

With the legislative history in mind, the *Knudsen* court stated:

By treating the proceeds of transactions that qualify for beneficial treatment under § 1222(a)(2)(A), in effect, as the "last dollars in," and, therefore, subject to the ghest marginal tax rate, the "marginal method" maximizes the percentage of the taxes to which beneficial (unsecured) treatment will apply, reducing the IRS's "veto" power, and making the debtors' reorganization plan more feasible and, hence, more confirmable. The IRS's method, in contrast, would minimize the taxes entitled to beneficial treatment and reinstate much of the IRS's "veto" power, thereby "fritter[ing] away" the benefits of § 1222(a)(2)(A) in stripping priority from "claims" of "gov-

ernmental units," at least to the extent that such "claims" are tax claims.[58]

We agree.[59]

Further, as the bankruptcy court pointed out, the IRS does not always use the proportional method. At least two tax provisions utilize the marginal method to some extent in calculating the amount of estate tax due, another type of tax that is imposed on the basis of a graduated progressive rate schedule. First, in calculating the estate taxes for special use valuation under IRC § 2032A,[60] the IRS utilizes the marginal method.[61] The IRS also requires the tax on prior transfers under IRC § 2013[62] to be computed using the marginal method.[63] The *Knudsen* court also found this reasoning persuasive, quoting the bankruptcy court below.[64]

Moreover, we believe there are other rationales supporting use of the marginal method. First, the IRC is replete with tax provisions that treat farmers preferentially compared to other taxpayers, not the least of which is IRC § 1301.[65] Because of the

57. *Id.*

58. *Knudsen*, 581 F.3d at 718 (quoting *Knudsen*, 389 B.R. 643, 668–69 (N.D.Iowa 2008)).

59. Although there appears to be no new legislative history specific to this provision when it was enacted as part of BAPCPA, another provision of BAPCPA clearly illustrates that Congress continued to be concerned about the critical role of federal income tax consequences in determining a Chapter 12 plan's feasibility. Prior to BAPCPA, § 1231(d) permitted a plan proponent to "request a determination, limited to questions of law, by a State or local governmental unit . . . of the tax effects . . . of the plan." BAPCPA amended § 1231(d) by deleting the words "a State or local" and replacing them with the word "any," thus allowing a plan proponent to seek a determination of the tax effects of a plan from the IRS. 11 U.S.C. § 1231(b). *See also* IRS Rev. Proc.2006–52, 2006–2 C.B. 995.

60. IRC § 2032A. This tax code provision is a special valuation rule that permits farm and certain other real property to be valued based on its actual use rather than at a hypothetical

fair market value which takes into account its highest and best use.

61. *Order on Cross–Motions for Summary Judgment* at 14, *in* Appellant's App. at 209.

62. IRC § 2013.

63. *Order on Cross–Motions for Summary Judgment* at 14, *in* Appellant's App. at 209 (citing Robert J. Stommel & Lester B. Law, *Planning to Maximize the § 2013 Credit*, 72 Fla. B.J. 66 (Jan.1998)).

64. *Knudsen*, 581 F.3d 696, 717–18 (8th Cir. 2009) (quoting *In re Ficken*, Case No. 05–52940–HRT, Adversary No. 08–01687–HRT, slip op. at 14 (Bankr.D.Colo. July 30, 2009) (unpublished)).

65. IRC § 1301. Other preferences afforded to farmers by the IRC include, but are not limited to: 1) an exception for qualified farm income to the general rule that the benefit derived from discharge of indebtedness must be included in income pursuant to IRC § 108(a)(1)(C); 2) the ability to carry back a

nature of their business, IRC § 1301 permits farmers (and now fishermen) to calculate taxable income on a three-year income averaging basis.[66] Other taxpayers do not have this option. As explained by the Treasury Department when it released final regulations under this tax code section, the policy underlying the provision is to limit "the adverse effects of a progressive rate structure on farmers whose income varies significantly from year to year in response to fluctuations in the farm economy."[67] If the IRC contains a provision aimed at alleviating the harshness of the progressive rate structure for farmers on a regular basis, we see no reason why the IRS should object to use of the marginal method in the § 1222(a)(2)(A) context. The sale of farm assets by a debtor/farmer in anticipation of or during bankruptcy reorganization creates a bunching of income in one year which can push the debtor/farmer into a much higher tax bracket.[68]

Additionally, the disparity between the amount of taxes afforded beneficial treatment under the proportional method versus the marginal method is not caused strictly by the increased marginal rates. Other provisions of our extremely complicated tax code work together to decrease the benefit of § 1222(a)(2)(A) when the proportional method is used. Specifically, if the proportional method is used, debtors/farmers may be deprived of certain income tax deductions and credits they are otherwise entitled to when using the marginal method. This is the result of the part that a taxpayer's adjusted gross income ("AGI") plays in determining his or her bottom line tax liability. When a taxpayer's AGI reaches a certain "threshold" level, certain personal tax deductions that are allowed to taxpayers with lower levels of AGI are either reduced in amount or eliminated entirely.[69] The same is true for several common personal tax credits.

Personal deductions and credits are those that are unrelated to the cost of earning income. Generally speaking, personal expenses are not deductible,[70] but for policy reasons and/or based on ability to pay, Congress permits some personal expenses, such as costs for medical care, to be deducted,[71] and gives credits for others,

net operating loss for a five-year period (as opposed to a two year period for other taxpayers) pursuant to IRC § 172(b)(1)(G); and 3) significantly more lenient requirements regarding estimated tax payments pursuant to IRC § 6654(i). Additionally, there are tax code variations with respect to several farm business expenses and deductions. As stated in one prominent tax treatise, "[g]enerally, the rules applicable to deductions and accounting methods apply to farming. However, in certain instances greater benefits are available for carrying on the trade or business of farming." Jacqualin Friend Peterson, 7 *Mertens Law of Federal Income Taxation* § 25H:27 (2010).

66. The averaging provision applies only to farm income and not to a farmer's other sources of income.

67. T.D. 8972, 2002–1 C.B. 443 (Jan. 8, 2002).

68. In tax year 2006, the tax brackets were 10%, 15%, 25%, 28%, 33% and 35%. *See IRS Rev. Proc.2005–70*, at § 3.01, 2005–2 C.B. 979, for rate schedules. For the Fickens, married taxpayers who filed jointly, use of the marginal method resulted in their taxable income of $46,639 being taxed at rates of 15% and below. *See 2006 Form 1040* at 2, *in* Appellant's App. at 19. If the proportional method were used, their taxable income of $185,439 would be taxed at rates of 28% and below. *See Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166.

69. The AGI threshold level varies depending on the particular deduction or credit.

70. IRC § 262.

71. *See* IRC § 213.

such as tuition for higher education.[72] However, when a taxpayer's AGI reaches a certain level, he or she is perceived as a "high income taxpayer" who should not benefit from these personal deductions and credits.[73]

In this case, when the marginal method is used, the Fickens' AGI for purposes of determining certain allowable deductions and credits is $77,251,[74] but when the proportional method is used, it is $212,594.40.[75] The IRS's calculations indicate that when the proportional method is used, the Fickens lose the benefit of at least the following: $3,457 in itemized deductions on Schedule A, the education credit in the amount of $1,437, and the child tax credit in the amount of $1,000.[76] Additionally, use of the proportional method subjects the Fickens to alternative minimum tax and increased self-employment taxes.[77] These are not the only dispropor-

---

**72.** *See* IRC § 25A.

**73.** The credits are more valuable to a taxpayer because they reduce tax liability dollar for dollar, while a deduction only decreases the tax base and save taxes only in a percentage equal to the marginal rate of tax.

**74.** *See 2006 Form 1040* at 2, *l.* 38, *in* Appellant's App. at 19.

**75.** *See Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166.

**76.** *Generally compare Exhibit 1 to Plaintiffs' Memorandum Brief in Support of Their Motion for Summary Judgment, in* Appellant's App. at 87 with *Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166.

With respect to the reduction of itemized deductions, compare total deductions of $14,112 taken by the Fickens on *Schedule A in* Appellant's App. at 23, to deductions of only $10,655 allowed by the IRS on *Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166. The IRS did not provide detailed tax calculations, but the cutback is likely due to the allowance of a deduction for miscellaneous itemized expenses only to the extent they exceed 2% of AGI pursuant to IRC § 67, and an overall limitation on itemized deductions imposed pursuant to IRC § 68 when the AGI of married filing joint taxpayers exceeds $150,500. *See also Schedule A, ll.* 25 and 28, *in* Appellant's App. at 23 and *IRS Rev. Proc.2005–70* at § 3.11.

With respect to the elimination of the education credit, compare credit of $1,437 taken on line 50 of *2006 Form 1040* at 2, *in* Appellant's App. at 19, with *Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166, which shows no education credit. Pursuant to IRC § 25A(d), availability of the education credit begins to be phased out for married filing joint taxpayers with AGI in excess of $90,000. *See IRS Rev. Proc.2005–70* at § 3.05.

With respect to elimination of the child tax credit, compare credit of $1,000 taken on line 53 of *2006 Form 1040* at 2, *in* Appellant's App. at 19, with *Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166, which shows no child tax credit. Pursuant to IRC § 24(b)(2), availability of the child tax credit begins to be phased out for married filing joint taxpayers with AGI in excess of $110,000.

**77.** *See Exhibit 1 to Plaintiffs' Memorandum Brief in Support of Their Motion for Summary Judgment, in* Appellant's App. at 87 and *Exhibit B to Declaration of Tamara L. Kotzker, in* Appellant's App. at 166. The additional self-employment taxes of $8,357.20 result from inclusion of the proceeds from the sale of the calf inventory on Schedule F, Profit or Loss From Farming. The alternative minimum tax imposed pursuant to IRC § 55 appears to be $2,199. The policy behind the alternative minimum tax is to ensure that higher income taxpayers pay their fair share of tax. As explained in a prominent tax treatise:

In the 1960s, high-income taxpayers were able to pay relatively low amounts in taxes compared to middle- or low-income individuals. Economic income was not being reflected in the computation of taxes. Generally, high-income taxpayers were able to take advantage of certain tax credits and shelters provided by the Code at that time. Because of this inequity, Congress enacted the alternative minimum tax.

Amelia Legutki, *1 Mertens Law of Federal Income Taxation* § 2A:01 (2010). However, the alternative minimum tax provisions are now quite controversial because they apply to far

tionately negative tax consequences associated with a high level of AGI. Other debtors/farmers with an unusually high AGI due to gains on sales of farm assets could potentially lose the benefit of deductions for medical expenses,[78] casualty and theft losses,[79] and even personal exemptions,[80] and this list is not exhaustive. We do not believe Congress intended the relief afforded farmers under § 1222(a)(2)(A) to be calculated in such a way that makes them ineligible for personal deductions and credits when they fall into the "high income taxpayer" category only because they have been forced to sell farm assets in the process of reorganizing under the protection of the bankruptcy laws.

The relief Congress extended to farmers by enacting § 1222(a)(2)(A) would be significantly curtailed were we to adopt the proportional tax allocation method as the appropriate calculation method. As a result, we hold that the bankruptcy court correctly determined that the amount of income taxes entitled to beneficial treatment under § 1222(a)(2)(A) should be determined using the marginal tax allocation method.

## V. CONCLUSION

The bankruptcy court correctly determined that: 1) § 1222(a)(2)(A) strips the priority of income taxes generated by post-petition sales of farm assets; 2) the calf inventory constituted a farm asset used in the debtors' farming operation for purposes of § 1222(a)(2)(A); and 3) the

more taxpayers than originally envisioned, and former IRS commissioners and the American Bar Association alike have recommended that they be scrapped in their entirety. Daniel S. Goldberg, *To Praise the AMT or to Bury It*, 24 Va. Tax Rev. 835 (Spring 2005).

78. Deductions for medical expenses are allowed by IRC § 213 only to the extent they exceed 7.5% of AGI.

amount of income tax afforded beneficial treatment under § 1222(a)(2)(A) is calculated using the marginal tax allocation method. Thus, the bankruptcy court's order is AFFIRMED in all respects.

79. Deductions for casualty and theft losses are allowed by IRC § 165(c)(3) & (h)(2) only to the extent they exceed 10% of AGI.

80. Deductions for personal exemptions ($3,300 per person in tax year 2006) are phased out by IRC § 63 for married filing joint taxpayers like the Fickens with AGI in excess of $225,750. *See IRS Rev. Proc.2005–70* at § 3.17.